IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA D., | ) |
| | ) |
|     Plaintiff, | ) |
| | )   No. 20 C 1763 |
| v. | ) |
| | )   Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Before the Court are Plaintiff Sandra D.'s[3] motion for summary judgment seeking remand of the final decision of the Commissioner denying her Disability Insurance Benefits ("DIB") (D.E. 23) and the Commissioner's cross-motion to affirm the decision. (D.E. 27.)[4]

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On May 11, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 15.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

[4] On January 17, 2020, the Appeals council denied Plaintiff's request for review rendering the ALJ's decision as a final decision of the Commissioner. (R. 1.)

I.       ADMINISTRATIVE RECORD

    A.       Medical Evidence

Plaintiff has diabetes, chronic obstructive pulmonary disease ("COPD"), and a nerve impairment in her right leg[5]. She contends that her impairments prevented her from working on December 31, 2015, her alleged onset date ("AOD"). (R. 205.) Her date last insured was originally set at March 31, 2016; at a hearing before an administrative law judge ("ALJ") on August 10, 2018, the judge acknowledged that Plaintiff's DLI was actually September 30, 2017. (R. 38.)

Plaintiff began seeing primary care doctor Santinder Dalawari., M.D., on July 10, 2012. (R. 355.) He initially treated her for diabetes for which he prescribed Metformin, COPD for which he prescribed an inhaler, and high cholesterol, for which he prescribed Simvastatin. (R. 359-60.) Dr. Dalawari was still treating Plaintiff for these conditions on her AOD.[6] On March 9, 2016, Plaintiff visited the emergency department of a local hospital complaining of pain in her lower back that radiated down her right leg; she exhibited tenderness and spasms on the right side and a positive straight leg raise test and was given the pain medications Naproxen and Tramadol (a narcotic.) (R. 556-58.) The next day Plaintiff visited Dr. Dalawari with the same complaint. (R. 394.) Dr. Dalawari diagnosed polyneuropathy and prescribed the pain medication Gabapentin. (R. 397.) Plaintiff's depression screen was normal and no follow-up was indicated. (R. 395, 398.) Plaintiff underwent an EMG in May that confirmed the diagnosis of diabetic neuropathy (R. 624-25.) At follow-up appointments in May and July 2016, Dr. Dalawari continued to treat Plaintiff's diabetes, COPD, high cholesterol and polyneuropathy, which she reported had spread to her left

---

[5] What the ALJ refers to as "nerve impairment" is presumed to be Plaintiff's diagnosed polyneuropathy or diabetic neuropathy, which is nerve pain in the extremities that occurs as a result of diabetes.

[6] In early 2015 Plaintiff underwent surgeries to remove a vocal cord polyp and her appendix; she does not allege any ongoing problems related to these two issues. (R. 395.)

leg as well; the doctor increased her dosage of Gabapentin and added Lyrica for nerve pain. (R. 401, 405, 512, 595.) In July, a neurologist diagnosed Plaintiff with either lumbar radiculopathy or lumbar plexopathy (nerve pain originating in the lower spine) and confirmed after further imaging that the neuropathy was related to Plaintiff's diabetes. (R. 623, 625.)

In September 2016, Plaintiff visited Dr. Dalawari with increased pain "all over," complaining that her neuropathy and arthritis in her neck and back were "horrible." (R. 607.) The doctor maintained Plaintiff's diabetes medications and increased her dosage of Lyrica. (*Id.*) Dr. Dalawari increased Plaintiff's Lyrica again in October 2016. (R. 612.) At follow-up appointments in January and February 2017, Dr. Dalawari maintained Plaintiff's medication regime. (R. 614-17.) In October 2017, Plaintiff had an abnormal spirometry, which is a test of pulmonary function. At an appointment that month with Dr. Dalawari, Plaintiff complained of depression, and her doctor started her on the anti-depressant Paroxetine. (R. 626.)

Plaintiff completed a function report on May 13, 2016 in which she stated she had sharp, shooting pains in her right leg, that she was in pain most of the day, and that it woke her up at night. (R. 249-53.) She was able to make simple meals, wash dishes, wipe down her counters, go grocery shopping, watch television, and take slow walks outside. (R. 250.) She also wrote that she could lift four pounds and walk half a block before needing to rest and could lift a bag of groceries but not garbage or laundry. (R. 256, 258.) She experienced numbness, tingling, and sharp pains in her legs at various times in addition to shortness of breath. (R. 271.) Also in May 2016, Plaintiff's daughter and one of Plaintiff's friends completed third-party function reports stating that Plaintiff often suffered from leg pain and that she was unable to stand or kneel for very long. (R. 283-84.)

The record also contains a number of medical opinions. On May 20, 2016, non-examining state agency doctor Phillip Galle, M.D., noted that Plaintiff had polyneuropathy, COPD, and

3

diabetes but that there was insufficient evidence to establish an RFC prior to March 31, 2016, which was incorrectly given as Plaintiff's DLI. (R. 87.) State agency doctor Glenn Pittman, M.D., opined on May 19, 2016 that the evidence did not substantiate the existence of a mental health impairment at all. (R. 88.) On reconsideration on July 27 and 29, 2016, state agency doctors Young-Ja Kim, M.D., and Leon Jackson, Ph.D, affirmed the original opinions, with Dr. Kim specifying that the medical evidence of record was not sufficient to establish an RFC prior to March 31, 2016. (R. 78-82.)

Dr. Dalawari completed three opinions. On July 15, 2016, he opined that Plaintiff's leg pain and peripheral neuropathy limited her to walking no more than one-fourth of a block at a time, that she could sit for up to 45 minutes at a time and stand for 15 minutes at a time, and that she could sit, stand/walk for a total of two hours in an eight-hour workday. (R. 598-99.) Dr. Dalawari also opined that Plaintiff needed a job that allowed her to change positions at will between sitting, standing, and walking. (*Id.*) On November 16, 2017, Dr. Dalawari completed an RFC form that opined Plaintiff could walk less than one block, sit for 45 minutes at a time, stand for ten minutes at a time, and sit and stand or walk for less than two hours each in an eight-hour workday. (R. 707-09.) Dr. Dalawari also opined that Plaintiff needed to be able to shift positions during the workday, would need unscheduled breaks every half hour, and would need ten minutes of rest before returning to work. (R. 708.) Finally, on January 8, 2018, in response to questions from Plaintiff's attorney, Dr. Dalawari opined that Plaintiff was unable to hold a job that required her to be on her feet for six to eight hours in a workday, that she could not sit for more than 30 minutes at a time, and that her pain would interfere with her ability to concentrate. (R. 629-33.)

B.     HEARING

The Plaintiff testified that after being diagnosed with diabetes in 2014, her health got progressively worse between 2015 and 2017, particularly with respect to an increase in pain throughout her entire body. (R. 40.) Specifically, while the pain started in her feet, it subsequently spread to her legs and then her hands and fingers. (*Id.*) On questioning by the ALJ, Plaintiff explained that in 2015, she was self-employed, running a hotdog stand and earning $33,000. (R. 41.) She sold the stand after having two surgeries, which coincided with her AOD. (*Id.*) Thereafter, in 2016 and 2017, Plaintiff testified that she worked eight to nine hours per week as a waitress, taking breaks and alternating between sitting 15 to 20 minutes and walking around for five to 10 minutes as needed, although the actual amounts of time varied day-to-day. (R. 46-47.) Her neuropathy began spreading from her legs to her arms and hands in early 2018 and continued to be treated by various medications, including Gabapentin. (R. 52.) With respect to her COPD, Plaintiff testified that she took a single puff of her inhaler before bed and did not take any other medications. Finally, Plaintiff testified that she asked her doctor for a referral to someone to speak to about her depression, but she was having trouble getting an appointment with a therapist. (R. 53.) She was taking medication that helped her mental health symptoms to some extent. (*Id.*)

A vocational expert ("VE") also testified. He explained that Plaintiff's previous work as a fast-food manager was a skilled position performed at the light level. (R. 59.) After the ALJ provided a number of hypotheticals, including the RFC that he ultimately assigned to Plaintiff, the VE testified that while Plaintiff could not perform her past work, the hypotheticals the ALJ was describing all included almost a full range of light, unskilled work and that there were significant jobs in the national economy that Plaintiff could perform, even with limitations on activities such as kneeling, crawling, or being around hazardous environments or pulmonary irritants. (R. 60-

62.) On further questioning from the ALJ, the VE confirmed that there were still significant jobs Plaintiff could perform even if she had to change positions every 45 minutes and assume a new position for five minutes without losing concentration or work duties. (*Id.*)

### C. ALJ OPINION

After discussing the five-step process for determining disability, the ALJ found that as of her date last insured ("DLI") of September 30, 2017, Plaintiff had the severe impairments of diabetes mellitus, chronic obstructive pulmonary disease ("COPD"), and nerve impairment right lower extremity. (R. 15.) The ALJ further held that Plaintiff's vocal cord polyp was non-severe because it did not interfere with her daily functioning and that her mental impairment was also non-severe because did it not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities. (R. 16.) After explaining why none of the Plaintiff's impairments met a Listing, the ALJ set her residual functional capacity ("RFC") as being able to perform light work, except that Plaintiff could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; could work occasionally in hazardous environments such as around unprotected heights, near moving mechanical parts, and operate a motor vehicle; could occasionally work in environments of humidity and wetness, dust, odors, fumes, pulmonary irritants, and in extreme cold; could assume no position for longer than 45 minutes, and if Plaintiff did need to sit, stand or walk for 45 minutes at one time, she must be allowed assume a different position for five minutes before resuming the prior position without abandoning her workstation or losing concentration on her assigned work duties. (R. 18.)

In support of his RFC determination, the ALJ acknowledged Plaintiff's allegations that her impairments affected her ability to sit, stand/walk for any significant period of time, bend, lift, squat, kneel, climb stairs and complete tasks, and that she had been prescribed numerous

6

medications to treat her conditions and symptoms. (R. 19.) He explained that Plaintiff's severe and non-severe impairments prevented her from sustaining the lifting and carrying requirements of medium work and thus she was limited to light work. With respect to the additional restrictions in the RFC, the ALJ stated that:

- Plaintiff's diabetes, in combination with her nerve impairment of the right lower extremity restricted her to never climbing ladders, ropes or scaffolds and occasionally climbing ramps and stairs, balancing, kneeling, crouching and crawling;

- Plaintiff's right lower extremity nerve impairment further restricted her to occasional work in hazardous environments;

- Her COPD limited Plaintiff to only occasional work in environments of humidity and wetness, dust, odors, fumes, pulmonary irritants, or extreme cold;

- Her diabetes in combination with her nerve impairment of the right lower extremity also restricted her to being able to stay in any position for no more than 45 minutes, and if Plaintiff did need to stay in one position for 45 minutes at one time, she had to be allowed to assume a different position for five minutes before returning to the prior position without abandoning her workstation or losing concentration. (R. 19.)

Next the ALJ explained his reasons for finding that Plaintiff's statements about the intensity, persistence and limiting affects of her symptoms were not entirely credible. Specifically, the ALJ stated that:

- Despite Plaintiff's COPD diagnosis, her examinations frequently showed lungs clear to auscultation and percussion, no rales, rhonchi or wheezing, and good breath sounds bilaterally;

7

- Plaintiff's symptoms from diabetes and nerve impairment of the right lower extremity were not as severe as she alleged because examinations frequently showed no acute distress, normal strength in the bilateral upper and lower extremities, no sensory losses, and slow but steady gait;[7]

- Plaintiff's admitted ADLs also suggested that she was not as limited as she claimed because she could prepare meals, preform housework, clean, watch television, and go shopping; (R. 20.)

- The fact that Plaintiff also worked after her AOD, albeit not at the level of substantial gainful activity, also indicated that her daily activities had at times been greater than she reported. (R. 20.)

In sum, the ALJ explained that Plaintiff's conservative treatment, "rather good objective diagnostic imaging,"[8] and physical/mental status examination findings, as well as admitted activities of daily living all suggested she was not as impaired as she alleged and instead remained able to work at the RFC level provided. (*Id.*)

With respect to opinion evidence, the ALJ gave little weight to the four opinions from state agency doctors, finding that evidence received at the hearing demonstrated that Plaintiff was more

---

[7]The ALJ cites to several records in support of his determination that Plaintiff's symptoms were not as severe as alleged. Exhibit 1F/14 is from 2012, more than three years before Plaintiff's AOD. (R. 362.) Exhibit 1F/48 is a short comment made as part of a "reviews of systems" during an appointment to refill of Plaintiff's diabetes medication and supplies that notes she has no joint swelling or pain. (R. 396.) Exhibits 2F at 16 and 41 are individual pages from groups of notes from follow-up appointments related to Plaintiff's appendix surgery and treatment for a neck abscess, the latter of which is dated about six months prior to Plaintiff's AOD. (R. 463, 488.) The appendectomy treatment note states that Plaintiff has "normal motor function" and the abscess treatment note says that Plaintiff has normal range of motion and strength; both are part of general reviews of systems recorded as part of the treatment of Plaintiff's other medical issues. (*Id.*) Exhibit 15F/5 is from an initial rheumatology appointment from April 2018 that notes Plaintiff has no joint tenderness and mostly normal range of motion and motor strength. (R. 744), and 16F/46 is one page from a multi-page document from Plaintiff's visit to a pain clinic in December 2017. (R. 796.)
[8] The only diagnostic imaging the ALJ identifies in his opinion is an EMG which was consistent with polyneuropathy due to diabetes. (R. 19.)

limited than the doctors' opined and also that they did not provide any functional limitations. (R. 20.)[9] The ALJ also gave little weight to the three opinions of Plaintiff's treating doctor, Satinder Dalawari, because even though Dr. Dalawari had been able to examine the Plaintiff, the ALJ found the restrictions in the opinions extreme, given Plaintiff's good objective examination findings (including no acute distress, normal bilateral extremity strength, no sensory loss and slow but steady gait) and Plaintiff's ability to work at least part time. (R. 20-21.) Finally, the ALJ gave little weight to the third-party function reports from Plaintiff's friend and daughter because neither one was an "acceptable medical source," but indicated that he "reviewed, analyzed, and considered," the information provided to assist him in assessing the severity of Plaintiff's impairments. (R. 21.)

The ALJ concluded his opinion by determining that although Plaintiff was unable to perform her previous job as fast-food restaurant manager, there were other jobs in the national economy that existed in significant numbers that she was able to perform, given the limitations of her RFC, and that she was therefore not disabled. (R. 22-23.)

## II.   LEGAL STANDARD

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. . . . [T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, the Court may "not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

---

[9] The ALJ actually wrote that he gave "great little weight" to the four opinions, but from reading the remainder of his reasoning, it is obvious that the word "great" is a typographical error.

### III. ANALYSIS

Plaintiff makes three arguments in support of remand: (1) the ALJ improperly evaluated evidence that was not considered by the non-examining state agency doctors; (2) the ALJ's RFC determination was incorrectly evaluated; and (3) the ALJ's analysis of Plaintiff's subjective symptoms was not supported by substantial evidence. As we explain below, we agree that the ALJ's RFC determination was not supported by substantial evidence, and that failure requires us to remand the case.

#### A. The ALJ's RFC is Not Supported by Substantial Evidence

In this case, the ALJ crafted an RFC holding that Plaintiff could perform a reduced range of light work that included a number of fairly detailed additional limitations. Although the ALJ cites to a few medical records to support his determination and that purportedly demonstrate the relative mildness of Plaintiff's symptoms, his reliance on these records - and thus his overall reasoning – does not rise to the level of substantial evidence.

For example, although he mentions that Plaintiff had "rather good diagnostic imaging," the ALJ cites to a single laboratory test - an EMG - that actually confirms Plaintiff's diagnosis of peripheral neuropathy. Several of the other treatment notes the ALJ mentions date from before Plaintiff's AOD, and another is a single page "cherry picked" from a longer document. Although the single page cited by the ALJ states Plaintiff could walk with a "slow but steady gait," the remainder of this treatment note diagnoses Plaintiff with chronic pain, degenerative joint disease in multiple sites, lumbar radiculopathy, and diabetic neuropathy, and also acknowledges that Plaintiff has joint pain, muscle pain, and decreased range of motion. *Felicia T v. Kijakazi,* No. 22 C 792, 2023 WL 157785 at *5 (N.D. Ill. January 11, 2023)*, citing Denton v. Astrue*, 596 F.3d 419,

425 (7th Cir. 2010) (ALJ may not "cherry pick" evidence that supports his conclusion and ignore other evidence the contradicts it.)

And although the ALJ's opinion lists each aspect of his RFC and attempts to match it up with one of Plaintiff's diagnoses, the ALJ's analysis falls well short of even the minimal analysis that would allow the Court to trace the ALJ's reasoning from evidence to conclusion. *See Hickey v. Berryhill*, 2017 WL 5001417, at *4 (N.D. Ill. Nov. 2, 2017) (remanding where "the ALJ did not explain what support he relied on or how he arrived at the calculations for positional limitations he included in the RFC"). In this case, although the ALJ's opinion summarizes some of the medical evidence from the record, "it does not *describe* how the evidence supports the positional limitation." *Channell v. Kijakazi*, No. 21 C 3094, 2022 WL 4386589, at *4 (N.D. Ill. Sept. 22, 2022), *emphasis in original*, (remanding where ALJ did not explain how he calculated RFC that included requirement that claimant be allowed to shift positions on specific schedule). Because we cannot determine how the ALJ arrived at his RFC determination regarding Plaintiff's ability to sit, stand, and change positions at work, we find that the ALJ opinion does not comport with the substantial evidence standard so as to support his determination.[10]

### B.     The ALJ's Analysis of the Medical Evidence was Faulty

The ALJ's attempts to shore up his RFC determination were further eroded by his improper treatment of the opinion evidence. The Seventh Circuit has explained that "ALJs must rely on expert opinions instead of determining the significance of particular medical findings

---

[10] Not only did the ALJ's analysis fail to support with substantial evidence his RFC determination, it also did not adhere to SSR 96-8p, which states that "the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The Seventh Circuit has held that failure to provide such a narrative discussion may be cause for remand. *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir., 2022) ("An ALJ's failure to comply with SSR 96-8p's requirements is a sufficient basis, by itself, for [the court] to reverse an ALJ's decision.").

themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). Although an ALJ does not need to accept or adopt any particular medical opinion or opinions in determining the RFC, "an ALJ cannot reject all the relevant medical RFC opinions and then construct a 'middle ground' and come up with [her] own RFC assessment without logically connecting the evidence to the RFC findings." *Darlene M. v. Kijakazi*, No. 19 CV 6389, 2021 WL 3773291, at *5 (N.D. Ill. Aug. 25, 2021) (cleaned up). Nor may an ALJ "play doctor" by "using her own lay opinions to fill evidentiary gaps in the record" caused by the absence of credited medical opinion evidence. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010).

Here, the ALJ rejected Dr. Dalawari's opinions because he found them "extreme," but the ALJ supported that determination by citing the same faulty evidence he offered in support of the RFC. And at the same time, there are other medical records that are consistent with Dr. Dalawari's opinions that the ALJ did not address, beyond stating that "evidence received at the hearing level shows that claimant is more limited than determined by the State agency consultants." (R. 20.) We do not know what that evidence is or how the ALJ analyzed it to decide that Plaintiff was more impaired than the agency doctors determined but less impaired than Dr. Dalawari opined. *Gibbons v. Saul*, 801 F. App'x 411, 417 (7th Cir. 2020) ("ALJs should not attempt to analyze the significance of medical findings without input from an expert.") See also, *Robert H. v. Saul*, No. 19-CV-50114, 2021 WL 2894161, at *4 (N.D. Ill. July 9, 2021) (remanding upon finding that ALJ played doctor by crafting RFC after no medical expert testified at the hearing and the ALJ rejected the opinions of state agency doctors).

12

## CONCLUSION

For these reasons, the Courts grant Plaintiff's motion to remand (D.E. 23) and denies the Commissioner's motion asking the Court to affirm the ALJ opinion. (D.E. 27.)

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: January 27, 2023**